UNITED STATES BANKRUPTCY COURT       **FOR PUBLICATION**
WESTERN DISTRICT OF NEW YORK

_____

In re:
                                     CASE NO. 06-21200
FAITH ANN PEASLEE,
                                     DECISION & ORDER
                          Debtor.

_____

GEORGE M. REIBER, ESQ.          GABRIEL J. FERBER, ESQ.
Chapter 13 Trustee              Nesper, Ferber & DiGiacomo, LLP
3136 S. Winton Road             Attorneys for Creditor GMAC
Suite 206                       One Towne Center, Ste. 300
Rochester, New York 14623       501 John James Audubon Parkway
                                Amherst, New York 14228


                          BACKGROUND

     On July 11, 2006, Faith Ann Peaslee (the "Debtor") filed a

petition initiating a Chapter 13 case (the "Peaslee Case"), and

George M. Reiber, Esq. (the "Trustee") was appointed as her Chapter

13 Trustee.

     The Debtor filed a Chapter 13 Plan which provided, pursuant to

Section 506(a)(1),[1] that the claim of General Motors Acceptance

---

[1]     Section 506 provides, in part, that:

        (a)(1)  An allowed claim of a creditor secured by a lien
        on property in which the estate has an interest, or that
        is subject to setoff under section 553 of this title, is
        a secured claim to the extent of the value of such
        creditor's interest in the estate's interest in such
        property, or to the extent of the amount subject to
        setoff, as the case may be, and is an unsecured claim to
        the extent that the value of such creditor's interest or
        the amount so subject to setoff is less than the amount
        of such allowed claim.  Such value shall be determined
        in light of the purpose of the valuation and of the
        proposed disposition or use of such property, and in
        conjunction with any hearing on such disposition or use
        or on a plan affecting such creditor's interest.

11 U.S.C. § 506 (2006).

Corporation ("GMAC"), secured by a 2004 Pontiac Grand Am (the "Grand Am"), was to be treated as an allowed secured claim in the amount of $10,950.00, representing what the Debtor alleged to be the retail value of the Grand Am with the balance of the amounts due GMAC in connection with the Debtor's August 28, 2004 purchase of the Grand Am was to be allowed as an unsecured claim.[2]  The allowed secured claim of $10,950.00 was to be paid with interest, in equal monthly installments through the Plan.

The Debtor's Chapter 13 Plan did not explain the reasons why it proposed a "cram-down" or "bifurcation" treatment of the GMAC Secured Claim, pursuant to Section 506(a)(1), rather than a treatment pursuant to that portion of Section 1325(a)(9) that has become known as the "Hanging Paragraph," since the Grand Am was purchased within 910 days of the date of the filing of the Debtor's petition.  The Hanging Paragraph in Section 1325(a)(9) provides that:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred with the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the

---

[2]    On October 10, 2006, GMAC filed a secured claim (the "GMAC Secured Claim") in the amount of $17,904.95.  This would result in a $6,954.95 unsecured claim under the Debtor's proposed Section 506(a)(1) plan treatment.

> debtor, or if collateral for that debt
> consists of any other thing of value, if the
> debt was incurred during the 1-year period
> preceding that filing.

On July 27, 2006, GMAC filed an objection to the Debtor's Chapter 13 Plan because it did not provide for GMAC's Secured Claim to be paid in full in accordance with the Section 1325(a)(9) Hanging Paragraph.

On September 8, 2006, the Trustee filed a Motion (the "Valuation Motion") which requested that the Court, pursuant to Section 506(a)(1), determine that GMAC had an allowed secured claim for the $10,950.00 retail value of the Grand Am and an unsecured claim for the balance of the GMAC Secured Claim. The Valuation Motion asserted that: (1) the Debtor purchased the Grand Am on August 28, 2004 for her personal use from Fox Auto Group, Inc. ("Fox Auto"), which was within 910 days of the filing of her petition; (2) in connection with her purchase, the Debtor traded in a 1999 Chevrolet Blazer (the "Blazer"), which was valued at $10,923.00 in the "Retail Installment Contract"[3] she entered into with Fox Auto; (3) at the time the Debtor traded in the Blazer, it was subject to a lien in favor of M&T Bank that was owed $16,905.00; (4) the August 2004 NADA Guide indicated that the Blazer had a NADA Guide trade-in value of $7,375.00; (5) the Retail

---

[3]     The Retail Installment Contract was later assigned to GMAC.

**Page 3**

Installment Contract itself indicated a negative trade-in value for the Blazer of $5,980.00, which was "rolled" into the cash price for the Grand Am and refinanced as part of the two separate transactions that were evidenced by the Retail Installment Contract; (6) the Retail Installment Contract indicated that the total amount financed for the acquisition of the Grand Am was $23,180.00, even though the July 2004 NADA Guide indicated that the manufacturer's suggested retail price for the Grand Am was $17,070.00; (7) although the Retail Installment contract granted the holder a security interest in the Grand Am for the entire amount financed, because the GMAC Secured Claim included rolled-in and refinanced debt, GMAC did not have a purchase money security interest for that portion of the debt, and, therefore, for all of the debt included in the GMAC Secured Claim, as specifically required by the Section 1325(a)(9) Hanging Paragraph; and (8) because GMAC had a purchase money security interest for only a portion and not all of the debt included in the GMAC Secured Claim, the exception set forth in the Section 1325(a)(9) Hanging Paragraph did not apply, and the GMAC Secured Claim was subject to the cram-down and bifurcation provisions of Section 506(a)(1).

On November 6, 2006, the Debtor filed a Brief in Support of the Valuation Motion, which asserted that: (1) as a general rule, if collateral secures debt for other than its own purchase price, the resulting security interest is not a purchase money security

interest for that portion of the debt; (2) because the Debtor refinanced at least $5,980.00 of negative equity as part of the two transactions evidenced by the Retail Installment Contract, that portion of the debt advanced to pay off the lien on the Blazer and included in the GMAC Secured Claim, which was not for the purchase price of the Grand Am itself, was non-purchase money and not secured by a purchase money security interest; and (3) since the GMAC Secured Claim was not all for purchase money debt, the provisions of the Section 1325(a)(9) Hanging Paragraph did not apply.

The Trustee has filed similar valuation motions in other Chapter 13 cases involving secured claims filed by American Honda Financial Corporation, American Suzuki Financial Services Company, LLC, Bank of America, ESL Federal Credit Union, HSBC Auto Finance (fka Household Automotive Finance Corporation) and Sovereign Bank (these creditors, along with GMAC, will be referred to collectively as the "Motor Vehicle Finance Group").[4] In each individual case, counsel for the Motor Vehicle Finance Group filed opposition to the valuation motion and most of them filed briefs in opposition to the motion.

---

[4] The Trustee initially filed objections to confirmation in the cases where he believed that because of the roll-in and refinance of negative equity, the Section 1325(a)(9) Hanging Paragraph did not apply, even though the respective debtor's plan provided for treatment of the secured claim under the Section 1325(a)(9) Hanging Paragraph. It was at the Court's suggestion that the Trustee filed the valuation motions in order to insure that the respective members of the Motor Vehicle Finance Group received clear and detailed notice of the Trustee's position and so the motions could then be set down for consolidated oral arguments.

On October 31, 2006, GMAC filed a brief (the "GMAC Brief") in opposition to the Valuation Motion, and on November 9, 2006, the Trustee filed a Reply Brief (the "Trustee Brief").

In the Trustee Brief, he explained that the cases he had identified for valuation motions were those where: (1) the applicable retail installment contract clearly set forth that negative equity was being rolled-in and refinanced; or (2) although the applicable retail installment contract did not clearly set forth that negative equity was being rolled-in and refinanced, the Trustee was able to analyze the manipulation of various figures in the contract to show that significant negative equity was in fact being rolled-in and refinanced.

As to this manipulation, the Trustee Brief set forth three common categories, as follows:

1.  Marking up the price of the vehicle being purchased: (a) over the dealer's sticker price; or (b) over the manufacturer's suggested retail price or average used retail price as listed in the NADA Guide;

2.  Marking up the value of the trade-in over the average trade-in value listed in the NADA Guide;

3.  Creating or manipulating deposits and rebates in order to hide the rolled-in and refinanced negative equity in the trade-in.

The position and principal arguments of the Trustee in his pleadings in the various valuation motions and at the consolidated oral arguments held on September 29, 2006 and November 15, 2006,

each of which involved attorneys for a number of the Motor Vehicle Finance Group, can be summarized as follows:

1.    In the Section 1325(a)(9) Hanging Paragraph, Congress used the term purchase money security interest, which is a security interest taken by a lender or reserved by a seller to secure its loan or financing of all or a portion of the purchase price for specific collateral acquired by a debtor;

2.    In each of the cases where the Trustee filed a valuation motion, the transactions evidenced by the respective retail installment contract included the identifiable refinance of the negative equity that the debtor had in the vehicle they traded-in when they acquired a replacement vehicle;

3.    There were many other Chapter 13 cases assigned to the Trustee where he believed that negative equity was refinanced in connection with the debtor's acquisition of a replacement vehicle within 910 days of the filing of their petition, but he did not bring valuation motions in those cases because the manipulations included in the respective retail installment contracts were such that he could not clearly demonstrate that negative equity had been refinanced;

4.    Since the Bankruptcy Code does not define the term purchase money security interest, reference must be made to applicable state law for a definition of purchase money security interest, for the cases in question, the provisions of Section

9-103 of the New York Uniform Commercial Code ("Section 9-103");[5]

5.    Section 9-103(a)(2) defines "purchase money obligation" as an obligation "incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used";

6.    The term "price" in the Section 9-103(a)(2) definition of "purchase money obligation" means what it has always meant in the Uniform Commercial Code, the price of the specific collateral being acquired, in the cases in question, the replacement vehicle obtained by the debtor, not the "cash sale price," "total sale price" or any other similar price defined

---

[5]     UCC Section 9-103 provides, in part, that:

(a) Definitions.  In this section:
    (1)    "purchase-money collateral" means goods or software that secures a purchase-money obligation incurred with respect to that collateral; and
    (2)    "purchase-money obligation" means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.
(b)    Purchase-money security interest in goods.  A security interest in goods is a purchase-money security interest:
    (1)    to the extent that the goods are purchase-money collateral with respect to that security interest;...
(g)    Burden of proof in non-consumer-goods transaction.  In a transaction other than a consumer-goods transaction, a secured party claiming a purchase-money security interest has the burden of establishing the extent to which the security interest is a purchase-money security interest.
(h)    Non-consumer-goods transactions; no inference.  The limitation of the rules in subsections (e), (f), and (g) to transactions other than consumer-goods transactions is intended to leave to the court the determination of the proper rules in consumer-goods transactions.  The court may not infer from that limitation the nature of the proper rule in consumer-goods transactions and may continue to apply established approaches.

NY UCC § 9-103 (2006).

in the New York Motor Vehicle Retail Installment Sales Act ("MVRISA") or the Federal Truth-In-Lending Act ("TILA"), which define those various terms like "cash sale price" and specifically allow the inclusion of refinanced negative equity. Those statutes permit the inclusion of the refinanced item only for the purpose of full and complete consumer financial disclosure, not for the purpose of defining or expanding upon the definition of the term "purchase money obligation" as set forth in Section 9-103(a)(2), which is a definition applicable to both consumer and commercial cases and collateral other than motor vehicles;

7. Since refinancing negative equity is not something that the majority of purchasers of motor vehicles require, but is only an optional separate transaction offered and combined with the transaction to acquire a replacement vehicle for the convenience of some debtors who have other ways to deal with the negative equity in their existing vehicles but choose not to pursue those options, providing a loan for a debtor to refinance the negative equity is not what is meant by "enabling" in the Section 9-103(a)(2) definition of "purchase money obligation." The term "enabling" is the loan or value provided by a seller that is necessary for a debtor to acquire the specific collateral itself;

8.    Any loan or value provided to refinance the negative equity in a trade-in vehicle is not used to "acquire rights in or the use of" the replacement vehicle collateral, as required in the Section 9-103(a)(2) definition of "purchase money obligation." That loan or value is used to pay off the existing lien on the trade-in vehicle;

9.    Since the secured claims of the Motor Vehicle Finance Group in each case included debt incurred by the debtors for the refinancing of their negative equity, which was not for a loan or value given that qualified as a purchase money obligation under Section 9-103(a)(2), their claims were not entirely secured by purchase money security interests;

10.   Since the New York Uniform Commercial Code does not mandate a dual status rule for consumer transactions where the transaction includes both purchase money and non-purchase money obligations, which would require the Court to bifurcate these secured claims into that portion which secures a purchase money obligation and that portion which secures a non-purchase money obligation, and afford the purchase money obligation purchase money security interest treatment, the Court is free to apply either a dual status or transformation rule;[6] and

---

[6]    Briefly stated, the transformation rule is that a purchase money security interest in consumer goods is "transformed" into a non-purchase money security interest where collateral secures more than its own purchase price.

11. The Court should adopt the transformation rule for numerous reasons, including that the Motor Vehicle Finance Group has asserted that in the majority, if not all, of these cases where negative equity has been refinanced, even after an evidentiary hearing, it would be impossible for the Court to determine the actual amount of the negative equity and the purchase money obligation.

The position and principal arguments of the Motor Vehicle Finance Group in their pleadings and at the consolidated oral arguments can be summarized as follows:

1. In those cases where the debtor's plan provided for treatment of the secured claim of a member of the Motor Vehicle Finance Group in accordance with the Section 1325(a)(9) Hanging Paragraph, rather than Section 506(a)(1), the Trustee had no standing to either object to confirmation or to bring a valuation motion;

2. Congress used the term "purchase money security interest" in the Section 1325(a)(9) Hanging Paragraph to mean simply that a security interest was taken by a lender or seller in connection with the purchase of a motor vehicle by a debtor within 910 days of the filing of that debtor's petition;

3. The members of the Motor Vehicle Finance Group, or their assignors, financed the price of the collateral within the meaning and intent of the Section 9-103(a)(2) definition of

"purchase money obligation," because the term price in that

Section is the same as the term "cash sale price" as defined

in the MVRISA, which specifically includes the amount of any

refinanced negative equity;

4.  The Bankruptcy Court has no power or authority to re-

characterize the price that the parties agreed to in their

respective retail installment contracts, which it must accept

as the price for purposes of Section 9-103(a)(2);

5.  The roll-in and refinance of negative equity is what "enabled"

the debtors in question to purchase their replacement vehicles

within the meaning and intent of the Section 9-103(a)(2)

definition of "purchase money obligation";

6.  The roll-in and refinance of negative equity is an allowable

expense that can be included in the "cash sale price" under

MVRISA, and is also the type of "expense" or value that can be

included in the price under Section 9-103(a)(2), as

contemplated by Comment 3 to Section 9-103;[7]

7.  The roll-in and refinance of negative equity was value given

and so used by the debtors in question to purchase their

---

[7]      UCC § 9-103 specifies that:

[t]he 'price' of collateral or the 'value given to
enable' includes '*[o]bligations for expenses incurred in
connection with acquiring rights in the collateral,*
sales taxes, duties, finance charges, interest freight
charges, costs of storage in transit, demurrage,
administration charges, expenses of collection and
enforcement, attorney's fees, *and other similar
obligations.* N.Y. U.C.C. Law § 9-103 Comment 3.
(McKinney 2006) (emphasis added).

replacement vehicles within the meaning and intent of the Section 9-103(a)(2) definition of "purchase money obligation";

8. The New York State Legislature used the term "purchase money security interest" in Section 2118 of the New York Vehicle and Traffic Law[8], an automatic perfection statute, without making any distinction between transactions that included the roll-in and refinance of negative equity and those that did not. That same lack of distinction and understanding of the term purchase money security interest redefined or at least expanded the definition of purchase money security interest in Section 9-103;

9. Congress knew from a number of sources that dealers often rolled-in and refinanced buyer's negative equity in their trade-ins. If Congress intended to distinguish those transactions where debtors rolled-in and refinanced negative equity in a trade-in from those that did not, it would have done so by using such terms as "only to the extent of a purchase money security interest" in the Section 1325(a)(9) Hanging Paragraph;

---

[8]     Section 2118.  Perfection of security interest

        (a) Unless excepted by section two thousand one hundred three of this title, a security interest in a vehicle of a type for which a certificate of title is required is not valid against creditors of the owner or subsequent transferees or lienholders of the vehicle without knowledge of the security interest unless perfected as provided in this section. A purchase money security interest in a vehicle is perfected against the rights of judicial lien creditors and execution creditors on and after the date such purchase money security interest is created.

NY CLS Veh & Tr § 2118 (2006).

10. If the Court were to find that the roll-in and refinance of the negative equity in a trade-in in connection with the purchase of a replacement vehicle within 910 days of a debtor's petition does not qualify for the exception set forth in the Section 1325(a)(9) Hanging Paragraph, Congress clearly intended to protect motor vehicle financers from cram down and bifurcation with respect to the actual purchase money debt included in their secured claims, so the Court should adopt the dual status rule, notwithstanding that the New York Uniform Commercial Code does not require the Court to do so in the case of consumer transactions; and

11. If the Court were to adopt a dual status rule, even though there could be significant evidentiary problems in determining the actual amount of the negative equity involved and the actual amount of the purchase money obligation in many cases, the secured creditors would bear the burden of proof to demonstrate the actual purchase money obligation, and the vast majority, if not all, of those cases would settle.

## DISCUSSION

### I. The State of Motor Vehicle Financing

Unlike years ago when vehicle loans were generally three years or less, a majority of vehicle loans today are for terms of five years or longer, and it is not unusual in Bankruptcy Court to see

seven and even eight year vehicle loans.  Since many buyers are no longer even required to make a down payment when they purchase a vehicle, many, if not most, vehicle loans of five years or longer end up "upside down" (the vehicle has a value of less than the outstanding loan) in less than four years.  As a result, a substantial number of trade-ins are upside down, and it is fairly routine in Bankruptcy Court for debtors to acknowledge at their Chapter 13 confirmation hearings that they had:  (1) "rolled-in" the unpaid balance of a loan on their trade-in when they acquired their current vehicle; and (2) no doubt that their trade-in was worth significantly less than the amount of the outstanding loan. The GMAC Brief confirmed this in stating that between 26% and 38% of buyers have negative equity in their trade-in vehicle.

Sometimes a debtor's negative equity can be $15,000.00 or more on a relatively modestly priced vehicle, especially if they have rolled-in a series of vehicle loans.

In this Court[9] it has been estimated that between 15% and 25% of Chapter 13 debtors have significant loan deficiency obligations from the repossession and sale of previously owned vehicles.  The reasons for the repossessions may vary, but the significant amount of the deficiencies are clearly because of the length of the underlying car loans.

---

[9]     The Rochester Division of the Western District of New York.

## II.  **Summary of Decision**

Prior to addressing the determination required under Uniform Commercial Code Section 9-103(h), the GMAC Secured Claim includes debt for which GMAC would otherwise have a purchase money security interest, as that term has always been understood by commercial attorneys and those involved in lending or retaining security interests in goods sold, because it includes amounts that were financed to allow the Debtor to pay the actual purchase price of the Grand Am itself.  However, the Secured Claim also includes debt for which GMAC does not have a purchase money security interest, because it includes amounts loaned to the Debtor to pay off the negative equity that she had in the Blazer, and those amounts were in fact used to pay off and discharge the lien that M&T Bank had on the Blazer, not to pay any part of the actual purchase price of the Grand Am.

Since:  (1) not all of the debt included in the GMAC Secured Claim is secured by a purchase money security interest, as required by the Section 1325(a)(9) Hanging Paragraph; (2) this is a consumer-goods transaction under Section 9-103; (3) Section 9-103(h) of the New York Uniform Commercial Code permits the Court in these situations to employ either a dual status rule or a transformation rule, on all of the facts and circumstances presented, this Court believes that the application of a

transformation rule is warranted and in the best interests of all of the parties in the Debtor's Chapter 13 case.

After application of the transformation rule, the GMAC Secured Claim is not entitled to the exception against cram-down and bifurcation provided for in the Section 1325(a)(9) Hanging Paragraph, because it is not afforded any purchase money security interest status, so the provisions of Section 506(a)(1) apply to the treatment of the GMAC Secured Claim.

## III. Reasons for the Determination that the Section 1325(a)(9) Hanging Paragraph does not apply

The Court has made the foregoing determinations for the following reasons:

### 1. Standing of the Trustee

Section 1302(b)(2)(B) provides that the trustee shall appear and be heard at any hearing that concerns confirmation of a plan.

Section 1324(a) provides in part that "a party in interest may object to confirmation of the plan," and the Chapter 13 trustee is a party in interest for purposes of Section 1324(a).

Section 1325 requires the Court to make affirmative findings that the provisions of that Section have been complied with, including the provisions of the Section 1325(a)(9) Hanging Paragraph.

In view of these Sections, this Court has always considered the Chapter 13 Trustee to be an officer of the Court who will assist it in insuring that the provisions of Section 1325 are complied with in connection with the confirmation of any Chapter 13 plan. To the extent that a plan provides for the improper treatment of a secured creditor, under the Section 1325(a)(9) Hanging Paragraph or otherwise, this Court has an expectation that the Trustee will advise the Court of that improper treatment by making an appropriate objection to confirmation.

In the cases where the Trustee has filed a valuation motion because his analysis indicated that a motor vehicle financer was not entitled to the exception treatment under the Section 1325(a)(9) Hanging Paragraph, he has advised the Court that: (a) other creditors, including unsecured creditors, would be negatively affected by such an improper treatment because that secured creditor would receive more than it was entitled to; and (b) the debtor's plans were otherwise confirmable, so debtors and their counsel were generally unconcerned about how their plan payments were distributed among creditors, as long as they were able to retain their vehicle and ultimately receive their discharge.[10]

---

[10] This may explain why more Bankruptcy Courts have not been presented with this purchase money security interest issue.

Case 2-06-21200-JCN    Doc 46    Filed 12/22/06    Entered 12/22/06 13:32:26    Desc Main
Document    Page 18 of 30

For the foregoing reasons, the Court finds that the Trustee had standing to file the valuation motions.

## 2.   **A Plain Reading of the Statute**

The GMAC Brief was correct in stating that, "[w]here the statute is clear, 'the sole function of the courts - at least where the disposition required by the text is not absurd - is to enforce it according to its terms.' *Id.,* citing *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6 (2000) (citations omitted)."

The Section 1325(a)(9) Hanging Paragraph requires that a motor vehicle financer have a claim secured by a purchase money security interest in the debt included in the secured claim.  For this Court, the Section is clear.  It requires that the debt included in the claim must be secured by a purchase money security interest, so that if all of the debt included in the claim is not so secured, the exception provided in the Section is not applicable.

This plain meaning of the statute certainly does not result in an absurd disposition.  This Court agrees with the Trustee that, given the history of the development of the Bankruptcy Code, there does not appear to have been a legal or equitable reason that Congress would have enacted a provision that would transform knowingly refinanced unsecured negative equity debt into secured debt not supported by collateral

value, and then require it to be paid in full to the detriment of other unsecured creditors.  This would undermine one of the fundamental policies of the Bankruptcy Code, which is equality of distribution among like creditors.  Therefore, reading the Section 1325(a)(9) Hanging Paragraph to confirm and promote this important fundamental policy would hardly be absurd.

In addition, even though not relevant here, because the statute is clear for this Court, any attempt to determine what the intent of Congress was with respect to these negative equity roll-in and refinance transactions would be absurdly speculative, since there is absolutely no legislative history that this Court is aware of that indicates that Congress:  (a) specifically addressed these transactions or even acknowledged their existence; or (b) believed that the term purchase money security interest may some how have been redefined in today's society so as to have a far different meaning than it has always been understood to have in the financial community.

3.    **The Uniform Commercial Code**

The term "price of the collateral," as used in Section 9-103(a)(2), has the same meaning that it has always had in connection with transactions for the acquisition of any collateral, including a motor vehicle, which is the actual

price of the collateral being acquired.[11] The term "price of the collateral" does not mean "cash sale price" or any other price that may be defined or referred to in any of the other state or federal statutes that the Motor Vehicle Finance Group has referred this Court to, including MVRISA and TILA, because those other statutes were not enacted in order to define or expand upon the definition of "purchase money obligation" under the Uniform Commercial Code. They were enacted to insure adequate financial disclosure in consumer transactions or for other unrelated reasons. Furthermore, those statutes have absolutely nothing to do with the relative rights of creditors, as Article 9 of the Uniform Commercial Code and the Section 1325(a)(9) Hanging Paragraph do. In fact, violations of MVRISA only result in fines and penalties.

This Court also rejects the assertion that a Bankruptcy Court must accept the "cash sale price" in a retail installment contract as the equivalent of the "price of the collateral" as used in Section 9-103(a)(2). As previously

---

[11] A plain reading of the statutory requirements indicates that they require the purchase money security interest to be in the item purchased, and that, as the judges below noted, the purchase money security interest cannot exceed the price of what is purchased in the transaction wherein the security interest is created, if the vendor is to be protected despite the absence of filing. "Except as to the TV set, if at all, the interest here is not a 'purchase money security interest' because it has not taken or retained by the seller of the collateral solely to secure all or part of *its* (emphasis supplied) price. Roberts attempted to make collateral secure debt other than its own price. The statutory exception does not reach the case." See *In re Manuel,* 507 F.2d 990 (5th Cir. 1975), which dealt with the roll-in and refinance of a prior furniture loan when the debtor acquired a new TV set, referring to the then-enacted Georgia Uniform Commercial Code.

stated, the price, however it is termed in a retail installment contract, is for the purpose of financial disclosure to the consumer, not for the purposes of determining whether debt is secured by a purchase money obligation and a purchase money security interest under Section 9-103 and the Section 1325(a)(9) Hanging Paragraph.

Furthermore, the Court rejects the assertion that the Bankruptcy Court cannot look behind the provisions of a contract between the debtor and a third party to determine its true nature. Bankruptcy Courts are often required to do this, for example when determining whether an alleged true lease is in fact a financing arrangement. In the cases in question, this Court is able and required to determine, for the purpose of enforcing the provisions of the Section 1325(a)(9) Hanging Paragraph, whether the claims of the secured creditors include debt that is or is not secured by a purchase money security interest, irrespective of what any retail installment contract may indicate is the overall "price" of a motor vehicle acquisition transaction for financial disclosure purposes.

Providing a loan to refinance negative equity on a trade-in, which may be a convenient but unnecessary option for a consumer purchasing a replacement vehicle,[12] is not value given

---

[12]     Such consumers could pay off the negative equity portion of the loans on their trade-in by taking loans against credit cards, lines of credit, home equity lines of credit or other facilities, which might even be repayable on more favorable terms.

to "enable" that consumer to acquire rights in or the use of the replacement collateral. The term "enable" refers to what it has always referred to, which is the value given to allow the debtor to pay, in whole or in part, the actual price of a new item of collateral being acquired, in these cases the replacement vehicles themselves.

Providing a loan to allow a debtor to pay off the lien on a trade-in to the extent that there is negative equity, and then rolling-in and refinancing that loan in the replacement vehicle acquisition transaction, is not value used to acquire rights in or the use of the replacement vehicle collateral and in fact so used, within the meaning of Section 9-103(a)(2). That portion of the loan provided is in fact used to pay off the lien on the trade-in vehicle.

Although paying off a consumer's negative equity in a trade-in may be permissible under MVRISA and considered to be a part of the "cash sale price," it is not the kind of expense included in the price of Section 9-103(a)(2), as contemplated by Comment 3 to Section 9-103.[13] The roll-in and refinance of negative equity in a trade-in vehicle is not the kind of

---

[13] UCC § 9-103 specifies that:

[t]he 'price' of collateral or the or the 'value given to enable' includes "*[o]bligations for expenses incurred in connection with acquiring rights in the collateral,* sales, taxes, duties, finance charges, interest freight charges, costs of storage in transit demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, *and other similar obligations.*" N.Y. U.C.C. Law § 9-103 Comment 3. (McKinney 2006) (emphasis added).

incidental and directly related expense, such as taxes and licence and registration fees, contemplated by Comment 3, especially when that negative equity can be $10,000.00, $15,000.00 or more. As all of the parties have confirmed, the majority of consumers purchasing motor vehicles do not have to roll-in and refinance negative equity in a trade-in, so electing to do that does not make it the kind of expense that would be "similar" to those expenses enumerated in Comment 3 to Section 9-103 that are incurred by all debtors acquiring similar collateral.[14]

In the Peaslee Case and in the other cases in question, there are simply two separate financial transactions memorialized on a single retail installment contract document for the convenience of some consumers and to allow the auto industry to sell more vehicles, which is good for both parties. However, the debt incurred in the separate optional transaction where negative equity is refinanced as a part of the combined transaction does not result in a purchase money obligation and the resulting security interest taken for that debt is not a purchase money security interest.

---

[14]     This Court has often said, no matter how neatly you paint stripes on a horse, you cannot turn it into a zebra. Although the arguments of the Motor Vehicle Finance Group are creative and interesting, their price, enabling and expense stripes painted on a refinanced negative equity debt horse, do not make that debt horse a purchase money obligation secured by a purchase money security interest zebra.

4. <u>**Section 2118 of The New York Vehicle and Traffic Law**</u>

This Court rejects the assertion by some in the Motor Vehicle Finance Group that, because the New York State Legislature used the term purchase money security interest in Section 2118 of the New York Vehicle and Traffic Law without distinguishing transactions where buyers purchase a vehicle without a trade-in or with a trade-in that clearly does not have negative equity, and those where buyers purchase a vehicle and trade-in another vehicle with negative equity, the Legislature, in enacting that automatic perfection statute, expanded the definition of purchase money obligation and purchase money security interest in Section 9-103 beyond an obligation and resulting security interest incurred to pay the actual purchase price of the vehicle acquired.

Once again, there is nothing in the legislative history to Section 2118 that indicates that the New York State Legislature specifically considered or addressed these negative equity roll-in and refinance transactions and intended to include them within the statute that was enacted to provide for automatic perfection because of the many problems experienced at the Offices of the Commissioner of Motor Vehicles in having lenders properly listed on the applicable title certificates.

Without knowing exactly which vehicle purchase transactions are included in Section 2118,[15] the fact that it requires a purchase money security interest begs the question as to whether negative equity roll-in and refinance transactions qualify.

Unlike the Section 1325(a)(9) Hanging Paragraph, the Section 2118 automatic perfection statute does not address the issue of the nature of the debt included in the claim of the motor vehicle financer, and whether it is all secured by a purchase money obligation and purchase money security interest. It requires only that there is a purchase money security interest. It may be that for this perfection purpose, the New York State Legislature was only concerned that the motor vehicle financer had made a loan of all or a portion of the actual purchase price of the acquired vehicle.

Furthermore, even though in providing for automatic perfection, Section 2118 affects the rights of other creditors, it only results in the motor vehicle financer having a perfected security interest in an "upside-down" vehicle when it drives off the lot.[16] Section 2118 does not mandate the full payment of the amounts owed to that motor

---

[15]    There are no cases on this question.

[16]    The Debtor owed $23,000.00 on the Grand Am that was worth $17,000.00 when she drove it out of the Fox Auto lot.

vehicle financer, unsupported by collateral value, in a reorganization proceeding to the detriment of other creditors.

In this regard, this Court has acknowledged that before addressing the Section 9-103(h) issues, GMAC had a purchase money security interest for some, just not all, of the debt included in the GMAC Secured Claim. However, unlike Section 2118, the Section 1325(a)(9) Hanging Paragraph addresses the debt included in a secured claim, which in this Court's view must be entirely secured by a purchase money security interest, not just a portion of it.

5. **Dual Status or Transformation**

Although the version of the revised Uniform Commercial Code that has been adopted in many states requires courts to implement a dual status rule in consumer transactions when an obligation is not entirely a purchase money obligation,[17] all the parties agree that Section 9-103(h) of the New York Uniform Commercial Code leaves the adoption of a dual status or transformation rule to the Court.

In the Peaslee Case, and the other cases where the Trustee has brought valuation motions because he has demonstrated that negative equity has been rolled-in and refinanced in connection with the purchase of a replacement vehicle within 910 days of the filing of the debtor's

---

[17]    See In re Vega, 344 B.R. 616 (Bankr. D.Kan. 2006).

petition, the Motor Vehicle Finance Group has successfully persuaded this Court that even after it conducted evidentiary hearings, it would be virtually impossible for the Court to determine either the actual amount of the negative equity or the actual amount of the purchase money obligation, in large part because the trade-in vehicle would in most cases not be available for inspection and valuation.[18]  Counsel for one of the Motor Vehicle Finance Group asserted that we would need two more Bankruptcy Judges just in the Rochester Division to conduct all of the potential evidentiary hearings that would be required.  On the other hand, counsel for several other members of the Motor Vehicle Finance Group predicted that if the Court were to adopt a dual status rule, most cases would settle.

The adoption of a dual status rule would seem then to leave the Court and the interested parties in the position of hoping that these cases settled or, if they did not, having to conduct numerous and extensive evidentiary hearings, possibly

---

[18]     The Trustee cited *In re Freeman*, 956 F.2d 252 (11th Cir. 1992) for his position that the Court should adopt the transformation rule.  That decision states in part that:

> Without some guidelines, legislative or contractual, the court should not be required to distill from a mass of transactions the extent to which a security interest is purchase money. (quoting *In re Coomer*, 8 Bankr. 351, 355, (Bankr. E.D.Tenn. 1980)).  Unless the lender contractually provides some method for determining the extent to which each item of collateral secures its purchase money, it effectively gives up its purchase money status.

requiring more judicial officers, with no guaranty of satisfactory determinations.

Although members of the bankruptcy community differ on what the intention of Congress may have been on a number of the provisions contained in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, almost all agree that one of its purposes was to reduce, and in many cases eliminate, the need for interpretation and the exercise of discretion by the Bankruptcy Courts. Instead, Courts were to enforce various new provisions as written.

In this regard, the evidentiary nightmare predicted by the Motor Vehicle Finance Group that would be experienced in the Bankruptcy Courts if they had to unwind the manipulations included in so many of the retail installment contracts where negative equity on a trade-in has been rolled-in and refinanced in order to determine: (a) the actual amount of the negative equity that was refinanced, when in most cases the trade-in vehicle is no longer available for retroactive valuation to the date of the retail installment contract, which could be as much as 909 days prior to the filing of the petition; and (b) the actual amount of debt that is a purchase money obligation under Section 9-103(a)(2), it is reasonable to conclude that Congress would have intended the Bankruptcy Courts to avoid making such determinations.

BK. 06-21200

For the foregoing reasons, this Court believes that the adoption of a transformation rule would best serve the interests of all of the parties when there is a roll-in and refinance of negative equity transaction combined with a replacement vehicle acquisition transaction.

## CONCLUSION

Pursuant to Section 506(a)(1), GMAC shall have an allowed secured claim of $10,950.00, reduced by any payments received in the Peaslee Case, to be paid in equal monthly payments together with the applicable *Till* rate of interest, to be set forth in the Confirmation Order presented to the Court by the Trustee, and an unsecured claim for $6,954.95.

The Court will enter separate Decisions & Orders based upon this Decision & Order in the other cases where the Trustee has filed valuation motions.

**IT IS SO ORDERED.**

_____/s/_____
HON. JOHN C. NINFO, II
CHIEF U.S. BANKRUPTCY JUDGE

Dated:  December 22, 2006